**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

EMILY DOCHERTY, GERALD DEARIE, :
JERMAINE MILLS, AND FREDERICK :
SCHARTNER individually and on :
behalf of all similarly :
situated persons, :
                    :
        Plaintiffs, : Civil Action No. 15-8785 (RMB)
                    :
     v. :
                    : **OPINION**
CAPE MAY COUNTY, *et al.*, :
                    :
        Defendants. :

APPEARANCES:

ROBERT MORLEY, ESQ.
Morley Law, LLC
1405 Wickapecko Drive, Suite 2
Ocean, N.J. 07712

TIMOTHY McILWAIN, ESQ.
McIlwain, LLC
2020 New Road, Suite A
Linden, NJ 08221
       On behalf of Plaintiffs

EDWARD PARK, Esq.
RICHARD GOLDSTEIN, Esq.
Marshal Dennehey Warner Coleman & Goggin
15000 Midlantic Drive, Suite 200
P.O. Box 5429
Mount Laurel, NJ 08054

       On behalf of Defendants

**BUMB**, United States District Judge

This matter comes before the Court to adjudicate the affirmative defense asserted in Defendants' Rule 12(b)(6) motion to dismiss (ECF No. 30), that Plaintiffs Emily Docherty, Jermaine Mills, Frank Schartner and Gerald Dearie (collectively "the Plaintiffs") failed to exhaust administrative remedies prior to suit as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"). The Court held an evidentiary hearing to resolve this matter on June 6 and June 27, 2018, at which time the parties had the opportunity to present evidence and testimony and to submit argument to the Court thereafter. For the reasons discussed below, the Court finds that with the exception of Plaintiffs' allegations regarding overcrowding, each Plaintiff have failed to properly exhaust administrative remedies under the PLRA; however, the administrative grievance procedures at Cape May County Correctional Facility were unavailable to Plaintiffs for the issue of overcrowding.[1]

I.    BACKGROUND

Defendants brought a Rule 12(b)(6) motion to dismiss Plaintiffs' Second Amended Complaint (ECF No. 30) based on Plaintiffs' failure to exhaust the administrative remedies prior to filing suit pursuant to the PLRA. (Defs.' Mot. To Dismiss, ECF

---

[1] The PLRA exhaustion requirement is inapplicable to claims in the Third Amended Complaint under the New Jersey Law Against Discrimination ("NJLAD.")

No. 42-4 at 5-9). On June 29, 2017, the Court denied Defendants' motion to dismiss for Plaintiffs' failure to plead exhaustion of administrative remedies; however, the Court ruled that an evidentiary hearing would be scheduled to address the PLRA exhaustion issue after discovery. (June 29, 2017 Order, ECF No. 73, at 1); see Bryant v. Rich, 530 F.3d 1368, 1377 n. 14 (11th Cir. 2008) ("if the district court looks beyond the pleadings to a factual record in deciding the motion to dismiss for failure to exhaust—a procedure closely analogous to summary judgment—then the court must assure that [the plaintiff] has fair notice of his opportunity to develop a record") (quoting Wyatt v. Terhune, 315 F.3d 1198, 1120 n. 14 (9th Cir. 2003); Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013) ("judges may resolve factual disputes relevant to the exhaustion issue[.]")

The evidentiary hearing was held on June 6 and June 27, 2018. (Minute Entries, ECF Nos. 171, 175.) Additionally, Plaintiffs proffer an expert report by Wayne A. Robbins, who has specialized knowledge in prison administration. (Plaintiffs' Trial Brief, ECF No. 182 at 17.) The expert report is offered by Plaintiffs to describe how the grievance procedures at the Cape May County Correctional Facility were unavailable to Plaintiffs. (Id.) Defendants oppose admission of the expert report. (Defendants' Trial Brief, ECF No. 181 at 56.)

II.  PLAINTIFF'S EXPERT REPORT

The Court first turns to the issue of the Plaintiffs' expert. Plaintiffs offer the expert report of Wayne A. Robbins to opine on the structure of the Cape May County Correctional Facility's grievance procedures and availability of the procedures to inmates. Admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702(a) primarily relates to relevance, whether the testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993). Exhaustion under the PLRA is a question of law to be determined by a judge, even if that determination involves the resolution of disputed facts. Small, 728 F.3d at 269.

Cape May County Correctional Facility's written grievance procedures are not complex and the testimony about how those procedures work in practice is not difficult to understand. The legal issue of whether Plaintiffs properly exhausted Cape May County Correctional Facility's written grievance procedures do not require specialized knowledge and skill beyond the experience of the Court. See Robinson v. Superintendent Rockview SCI, 831 F.3d 148, 153 (3d Cir. 2016) ("to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules, rules that are defined not by the PLRA, but by the prison grievance process itself") (internal quotations omitted).

Moreover, whether those procedures were in practice available to Plaintiffs can be determined by the Court from the evidence and testimony at the Hearing. See Ross v. Blake, 136 S. Ct. 1850, 1859, 1862 (2016) ("the court must perform a thorough review of materials and then address the legal issues … concerning the availability of administrative remedies.") Nor has this Court found any precedent for admission of expert testimony on the issue of PLRA exhaustion. Accordingly, because it will not assist the trier of fact to understand the evidence the Court determines the Expert Report of Wayne A. Robbins is inadmissible under Federal Rule of Evidence 702.

III.  LEGAL STANDARDS OF CLAIMS

A.  Exhaustion Under the PLRA

42 U.S.C. § 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Failure to exhaust under the PLRA is an affirmative defense, with the burden of proof on the defendant. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002). After the defendant establishes that the inmate failed to exhaust administrative remedies, the burden shifts to the inmate to show that such remedies were unavailable. Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018). "[E]xhaustion is a question of law to be determined by a judge, even if that determination requires the resolution of disputed facts." Small, 728 F.3d at 269.

Whether or not an administrative remedy is formally adopted by a State Department of Corrections is "irrelevant to the[] rationales for exhaustion." Concepcion v. Morton, 306 F.3d 1347, 1354 (3d Cir. 2002). An administrative remedy program satisfies the requirements for PLRA exhaustion if it (1) gives inmates the opportunity to inform prison administration about any complaints; (2) provides written responses to inmates; (3) subjects written responses to review by supervisors; and (4) requires signatures by multiple administrative parties for final resolution. Id. at 1354.

The administrative remedy program should provide "a forum through which inmates could potentially resolve their disputes, thereby reducing the quantity of prisoner litigation." Id. at 1354-55. Furthermore, "the remedy form submitted by the inmate and the written response provided by the prison administration [should] facilitate adjudication [in court] by clarifying the contours of the controversy." Concepcion, 306 F.3d at 1354-55 (citing Porter v. Nussle, 534 U.S. 516, 525 (2002).

Exhaustion of all available remedies is mandatory. Ross, 136 S. Ct. at 1857. Failure to comply substantially with the procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. Woodford v. Ngo, 548 U.S. 81, 92-94 (2006).

"Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies[.]" Ross, 136 S. Ct. at 1853. There are at least three circumstances where an official written administrative remedy procedure is unavailable. Id. at 1859. First, an administrative procedure is unavailable when corrections officers are "unable or consistently unwilling to provide any relief," resulting in a dead end. Id. (quoting Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). Second, an administrative remedy program "might be so opaque that it becomes, practically speaking, incapable of use." Id. at 1859. When rules are "so confusing that ... no reasonable prisoner can use them,"

then "they're no longer available. Id. Third, administrative remedies are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Where a prison's grievance procedure excludes remedies for certain issues, a district court might conclude that the grievance procedures were a dead end. See Shumanis v. Lehigh County., 675 F. App'x 145, 149 (3d Cir. 2017) (remanding for further development of the record where possible reading of prison grievance policy excluded issues of federal law from administrative remedies). Refusal to provide an inmate with a grievance form, if the form is necessary to exhaust administrative remedies, renders the grievance process unavailable within the meaning of § 1997e. See Spada v. Martinez, 579 F. App'x 82, 86 (3d Cir. 2014) (per curiam) (remanding where a fact question existed concerning whether prison officials refused to provide inmates with grievance forms).

B.   Claims Under the New Jersey Law Against Discrimination ("NJLAD")

Counts IV and V of the Third Amended Complaint are brought under the NJLAD, N.J. Stat. 10:5-12 et seq. The NJLAD does not require a plaintiff to exhaust administrative remedies before commencing an action. Mitchell v. W. Union, No. 06-949, 2007 WL 4440885 (JLL), at *3 n. 6 (D.N.J. Dec. 18, 2007) (citing N.J. Stat. 10:5-12); Davie v. Barnegat Bd. of Educ., No. CIV.A.09-5769 (MLC), 2010 WL 1186273, at *3 (D.N.J. Mar. 24, 2010).

8

IV. FINDINGS OF FACT ON PLRA EXHAUSTION

1. Plaintiff Emily Docherty was an inmate at Cape May County Correctional Facility when she instituted this putative class action on December 21, 2015. (Compl., ECF No. 1, ¶2.) On December 28, 2017, Plaintiffs filed a Third Amended Putative Class Action Complaint against Defendants. (Third Am. Compl., ECF No. 127.)

2. Plaintiffs, former pretrial detainees at Cape May County Correctional Facility ("Facility"), are putative class representatives for four separate classes of former, current, and future pretrial detainees and convicted inmates at the Facility. (Third Am. Compl., ¶¶9, 11-13, ECF No. 127.)

3. Plaintiff Docherty ("Docherty") is a former female pretrial detainee who was detained at the Facility on and off since December 21, 2015, and the putative class representative for all female inmates and pretrial detainees. (Id. ¶¶2, 9.) On behalf of female inmates and detainees, Docherty alleges that they are not provided with adequate feminine hygiene products, toilet paper and clean clothing. (Id. ¶¶42-44.)

4. Plaintiff Mills ("Mills") is a former male pretrial detainee who was detained at the Facility since September 2014, and the putative class representative for all Muslim inmates and pretrial detainees. (Id. ¶¶4, 12.) On behalf of all Muslim inmates and detainees, Mills alleges that they are forced to congregate in an unsanitary environment at the Facility and denied religious

study time and instruction in contrast to other religious groups. (Id. ¶¶45-55.)

5. Plaintiff Schartner ("Schartner") is a former male pretrial detainee with diabetes who was detained at the Facility between May 26, 2016 and October 14, 2016, and the putative class representative for all inmates and detainees with a disability who require reasonable accommodation. (Third Am. Compl. ¶¶5, 13, 57.) On behalf of all inmates and detainees with a disability, Schartner alleges that they are discriminated against and denied reasonable access to medical care and accommodation in violation of NJLAD. (Id. ¶¶56-65, 87-92.)

6. Plaintiff Dearie ("Dearie") is a former male inmate and pretrial detainee who was detained at the Facility, and the putative class representative for all inmates and detainees who have allegedly been harmed or have a reasonable apprehension of being harmed by exposure to mold, insect infestation and inadequate ventilation, resulting in their illnesses or apprehension of illnesses. (Id. ¶¶35-39.)

7. Plaintiffs allege that overcrowded and unsanitary conditions at the Facility violate the Fourteenth Amendment Due Process rights of pretrial detainees (Count I) and the Eighth Amendment rights of convicted inmates (Count II). (Id. ¶¶67-73.) Mills alleges that Muslim inmates' and detainees' religious rights are denied in violation of the First Amendment and the Fourteenth

Amendments (Count III), and the NJLAD (Count IV). (Third Am. Compl., ¶¶74-86, ECF No. 127.) Schartner alleges that disabled inmates and detainees are discriminated against in violation of NJLAD. (Count V) (Third Am. Comp., ¶¶87-92, ECF No. 127.)

8. Based on these allegations, Plaintiffs are seeking damages, attorney's fees and costs, and injunctive and equitable relief pursuant to 42 U.S.C. § 1983 and state law. (Id. ¶¶1-8, ECF No. 127 at 23-25.)

9. On May 15, 2018, this Court entered an Order scheduling an evidentiary hearing for June 6, 2018, to resolve the PLRA exhaustion issue. (May 15, 2018 Order, ECF No. 161.) On May 30, 2018, counsel for Plaintiffs filed the "Expert Report on Behalf of Plaintiff by Wayne A. Robbins." ("Robbins Report," ECF No. 165.)

10. On June 6, 2018, the Hearing was held and Plaintiffs Docherty, Schartner, and Dearie testified on behalf of Plaintiffs. (Minute Entry, ECF No. 171.)

11. At the Hearing, Defendants objected to Plaintiffs' informal request to produce Lieutenant Robert Campbell for Plaintiffs' case-in-chief. (June 6, 2018 Hr'g Tr. 11:4-18, ECF No. 172.) In response, Plaintiffs requested to read into the record the transcripts of Lieutenant Campbell's Rule 30(b)(6) deposition conducted over three days, in lieu of his live testimony. (Id. 11:20-12:18.) On August 8, 2018, the Court reviewed the deposition testimony of Lieutenant Robert Campbell and ruled that the

deposition testimony was admissible in part and inadmissible in part. (Order, ECF No. 183.)

12. Also at the June 6, 2018 hearing, the Court ordered the parties to submit briefing with respect to admissibility of expert testimony on PLRA exhaustion. (Minute Entry, ECF No. 171.)

13. The hearing was continued on June 27, 2018 and Plaintiff Jermaine Mills testified on behalf of Plaintiffs. Lieutenant Campbell testified on behalf of Defendants. After exhibits were admitted into evidence without objection, all sides rested. (June 27, 2018 Hr'g Tr., ECF No. 181 at 259-465.)

14. Lieutenant Campbell is currently employed with the Cape May County Sheriff's Office. He has been employed by the Sheriff's Office for more than 20 years. He worked in the Cape May County Correctional Facility during his entire career with the Sheriff's Office. Lieutenant Campbell began his career as an officer in 1997 and he was promoted to the position of Sergeant in 2006. In September 2010, he was promoted to the position of Lieutenant. (June 27, 2018 Hr'g Tr. 98:10-99:6, ECF No. 181 at 356-57.)

15. During his service in the capacity of sergeant, Lieutenant Campbell supervised corrections officers. Supervisory sergeants are also identified as "shift supervisors." (Id. 99:16-23, ECF No. 181 at 357.)

16. In 2013, Lieutenant Campbell was transferred to Inmate Affairs ("IA") as the Inmate Affairs Officer. IA is responsible

for dealing with inmate rights. (June 27, 2018 Hr'g Tr. 100:7-101:1, ECF No. 181 at 358-59.)

17. Once an inmate complaint rises to the level of an official grievance under the written grievance procedure, the grievance is forwarded to Lieutenant Campbell's attention to be addressed. (June 27, 2018 Hr'g Tr. 100:18-24, ECF No. 181 at 358.)

18. The Cape May County Sheriff's Office Standard Operating Procedure ("SOP") 1101 (Ex. D-4) regarding "Inmate Rights and Grievance Procedure" is disseminated to all staff at the Facility. (Id. 103:14-104:3, ECF No. 181 at 361-62.) SOP 1101 is issued electronically to all staff and requires their electronic signatures to indicate receipt and understanding of the SOP. (Id. 104:4-15, ECF No. 181 at 362.) The stated purpose of SOP 1101 is: "[p]rotecting the fundamental rights of the inmates assists in maintaining a balance of equity and fair treatment for the inmates within the correctional center, with emphasis on, the protection of the inmates from personal abuse, corporal punishment, personal injury, disease, property damage and/or harassment." (Ex. D-4 at CCC940.)

19. The Inmate Handbook was revised on April 1, 2013, March 6, 2014, and October 1, 2015. (Exs. D-1, D-2, D-3). The "Grievance Procedure[s]" appear on page 47 of the Handbook in each revision. The Grievance Procedures have remained the same since the April 1,

2013 revision to the Handbook. (June 27, 2018 Hr'g Tr. 110:18-21; 111:7-22, ECF No. 181 at 368-69.)

20. The inmates are provided with the Handbook during their intake process upon arrival at the Facility, pursuant to the Cape May County Sheriff's Office Standard Operating Procedure 406 (Ex. D-5; June 27, 2018 Hr'g Tr. 101:6-102:22, ECF No. 181 at 359-60.) "The purpose of the Inmate Handbook is to advise all inmates of the Cape May County Correctional Center of the institutional rules and regulations which the inmate must comply with while incarcerated." (Ex. D-5 at CCC945.)

21. During the intake process, an inmate's personal property is collected to be stored in the Facility's property room and certain items are issued to the inmate, including the Handbook. The information is recorded on "institutional property inventory receipt" and the receipt is placed in the inmate file maintained in the records department. (June 27, 2018 Hr'g Tr. 102:3-19; 108:2-109:7, ECF No. 181 at 360, 366, 367.) The inmate files are kept in the ordinary course of business by the Facility. (Id. 133:6-10, ECF No. 181 at 391.)

22. The goal of the Grievance Procedures at the Facility is to try to resolve the inmate's complaint at the lowest step of the procedure. (Id. 114:13-15, ECF No. 181 at 372.) The first step of the Grievance Procedure provides:

> 1. Resolving Inmate Problems/Issue Officer Level.

> a. Every effort will be made by the assigned tier and/or housing unit correctional officer, to resolve inmate problems or issues before they become grievances.
>
> b. Prior to submitting a formal grievance the inmate must try to resolve the problem with the Shift Supervisor first. If the issue involves the decision or behavior of the Shift Supervisor, the inmate has the right to circumvent the chain-of-command to present his/her grievance to the Inmate Affairs Officer.

(Ex. D-3 at CCC928.)

23. In practice, when inmates have complaints, they will initially speak to their assigned tier officer and the tier officer will address the problem if able to do so. (June 27, 2018 Hr'g Tr. 112:23-113:5, ECF No. 181 at 370-71.) Because an attempt is made to resolve the complaint verbally at this step, complaints resolved at Step 1 are not documented in writing. (Id. 120:19-121:2, ECF No. 181 at 378-79.) At Step 1 of the Grievance Procedures, complaints may be raised verbally to more than one tier officer. (Id. 165:12-21, ECF No. 181 at 423.) A verbal issue raised by an inmate to a tier officer does not proceed to Step 2 if the tier officer tells the inmate that the tier officer will resolve the problem. (Lt. Campbell Depo Tr. Feb. 13, 2018, 44:8-21, ECF No. 177-1.)

24. As the first step explains and as Plaintiffs understood, in order to commence the grievance process, he/she had to deal

with tier officers informally and escalate the issue by submitting a Request Slip if the concerns were not addressed by the tier officers. (June 6, 2018 Hr'g Tr. 153:15-22, ECF No. 181 at 214; 120:11-121:3, ECF No. 181 at 181-82; 130:19-21, ECF No. 181 at 191; 142:24-143:2, ECF No. 181 at 203-04; June 27, 2018 Hr'g Tr. 6:21-7:20, ECF No. 181 at 264-65.)

25.  If the tier officer cannot resolve the issue within "a reasonable amount of time," "more than likely it would be by the end of the shift," then the grievance moves to Step 2. (Id. 112:23-113-11, ECF No. 181 at 370-71.)

26.  If an inmate is satisfied with a tier officer's response, the Grievance Procedures are concluded.

27. In practice, if an inmate's concern cannot be resolved by the tier officer at Step 1, the tier officer would provide the inmate with an "Office of the Sheriff—Inmate/Staff Correspondence" form, often referred to as a "Request Slip." (June 27, 2018 Hr'g Tr. 118:11-15, ECF No. 177-2 at 376.) Request Slips are designed to contain information regarding the inmate's complaint and information regarding the attempts at resolution made at Step 1. Request Slips also require the date of the slip and the inmate's signature. (June 27, 2018 Hr'g Tr. 113:6-21, ECF No. 181 at 371.)

28.  The Grievance Procedures contained in the Handbook do not expressly refer to the Inmate/Staff Correspondence or Request Slip as part of the procedure. In practice, the Request Slip is

the "writing" that is referenced as part of the procedures in Step 2: "Matters that can't be resolved, and that become an inmate grievance, will be made known in writing to a Shift Supervisor." (Ex. D-3 at CCC928; June 27, 2018 Hr'g Tr. 156:24-158:13, ECF No. 181 at 414-16.)

29. Lieutenant Campbell is not aware of any incident when a tier officer refused to provide a Request Slip. (Id. 118:25-119:2; 137:10-12; ECF No. 181 at 376-377, 395.) Likewise, Lieutenant Campbell is not aware of any incident where a corrections officer failed to process a Request Slip or ripped up a Request Slip. (Id. 137:13-22, ECF No. 181 at 395.)

30. The Request Slip is forwarded to a shift supervisor, often a sergeant, who would in turn speak with the inmate regarding his/her concern and attempt to resolve the issue. (Id. 113:23-114:12, ECF No. 181 at 371-72.)

31. The Grievance Procedures provide:

> 2. Unresolved Inmate Problems/Issues Shift Commander/Shift Supervisor Level.
>
> Matters that can't be resolved, and that becomes an inmate grievance, will be made known in writing to a Shift Supervisor. The Shift Supervisor will in turn discuss the situation with the inmate and attempt to satisfy the grievance. The Shift Supervisor will file a written report with a copy of the grievance to the Inmate Affairs Officer indicating the outcome of the meeting.

(Ex. D-3 at CCC928.)

32. Once an inmate's complaint that was written on a Request Slip is resolved, the Request Slip is placed in the inmate's file in the records department. (June 27, 2018 Hr'g Tr. at 184:8-25, ECF No. 181 at 442.)

33. If a shift supervisor cannot resolve an issue raised by an inmate on a Request Slip at Step 2, then the matter is escalated to Step 3 of the Grievance Procedures. Step 3 of the Grievance Procedure is initiated by a "Cape County Correctional Center Inmate Grievance Form" (Ex. D-8), to be completed by both the inmate and the shift supervisor. The form is then forwarded to Lieutenant Campbell, who has been the Facility's IA Officer since 2013, for a decision. (Id. 119:11-22; 162:3-6, ECF No. 181 at 377, 420.)

34. The Court finds that if a shift supervisor promises a resolution to an inmate's complaint at Step 2 of the Grievance Procedures, and the inmate indicates his/her satisfaction with the promised resolution, it is incumbent on the inmate to submit a new Request Slip seeking a Grievance Form if the issue was not resolved as promised. The issue raised by the inmate would then proceed to Step 3 of the Grievance Procedures if still unresolved.

35. The Grievance Form required at Step 3 of the Grievance Procedures provides the following instructions:

> Inmates who feel that their rights have been violated; or feel that an institutional rule adversely affects their condition of confinement may invoke the grievance process. The aggrieved inmate must first attempt to resolve the grievance with the assigned tier

officer, prior to completing this form. No other forms or correspondence will be considered for official handling of an internal inmate grievance. Asterisk (*) means mandatory completion for the grievance to be accepted.

(Ex. D-8.)

36. The Grievance Form includes certain categories that can be checked: medical, disciplinary, food, religion, staffing, and other. If an inmate concern does not fit into one of the provided categories, "other" can be checked and allows for a description of the concern. The form also requires the inmate to provide his/her name, ID number, housing assignment, date, and signature. The form requires other information, including the name of the tier officer who first addressed the inmate's concern, the name of the supervising officer involved and the officer's comments. This is required to provide the IA Officer with information regarding the inmate's concern as it was processed through the first two steps of the Grievance Procedures. The form requires other information such as "Statement of Grievance," which provides the inmate with an opportunity to summarize his/her concern. (June 27, 2018 Hr'g Tr. 115:19-116:21, ECF No. 181 at 373-74.)

37. An inmate who was required to sleep on a mattress on the floor due to lack of bed space was not permitted to file a Grievance Form because there was no resolution to the lack of bed space. (Lt. Campbell Depo. Tr. 2/13/18 at 50-1 to 9, ECF No. 177-1; Lt. Campbell Depo. Tr. 2/21/18 at 38:24-39:55, ECF No. 177-2.)

38. In response to Schartner's complaints about overcrowded conditions, officers at the Facility told him that those issues were not grievable. (June 6, 2018 Hr'g Tr. 42:11-14, ECF No. 181 at 300.)

39. Forty-seven grievances were filed in 2013 through 2017 and none were about overcrowding. (Ex. D-9.)

40. Dearie complained about the overcrowded condition of the eating area and was told overcrowding is not a grievable issue. (June 6, 2018 Hr'g Tr. 87:5-13, ECF No. 181 at 148.)

41. The Facility does not provide prisoners with written guidance about what is a grievable issue and what is not. (June 27, 2018 Hr'g Tr. 148:5-149:1, ECF No. 181 at 406-07.)

42. According to the written Grievance Procedures, the Inmate Affairs Officer renders a decision at Step 3:

> 3. Unresolved Inmate Problems/Issues Inmate Affairs Officer
>
> Level Decision Results.
>
> If the grievance isn't resolved the Inmate Affairs Officer will review the grievance and render a decision. The Results of the Inmate Affairs Officer's decision will be forwarded to the inmate filing the grievance, in writing or with a private interview with the Inmate Affairs Officer.

(Ex. D-3 at CCC928.)

43. The Grievance Form also includes sections that the IA Officer is required to complete. The IA Officer's name and signature are required, along with his determination as to whether

the grievance is "substantiated" and the IA Officer's comments. (June 27, 2018 Hr'g Tr. 117:3-10, ECF No. 181 at 375.)

44. In practice, Lieutenant Campbell meets and speaks with the grieving inmates personally at Step 3. He will then write his conclusion on the Grievance Form. If the inmate requests a copy of the completed Grievance Form, Lieutenant Campbell provides a copy. A copy of the Grievance Form is then filed in the inmate's file in the records department of the Facility, whether the grievance was determined as substantiated or not. (Id. 117:11-118:10, ECF No. 181 at 375.)

45. Once an inmate issue or concern reaches Step 3—a formal grievance status—it is also included in the Facility's "Monthly Inmate Affairs Commander Report." (Ex. D-9.) The Report identifies the grieving inmate's name and ID number, grievance type, and status. A review of the Monthly Reports moved into evidence reveals that there are months when no grievances have been reported and other months when numerous grievances are reported. (See e.g. Ex. D-9 at CCC1725-1728). Moreover, certain grievances included in the Reports show the status of "substantiated," which indicates that the inmate's concern is legitimate. (June 27, 2018 Hr'g Tr. 122:14-125:22, ECF No. 181 at 380-383.)

46. A review of the Monthly Reports reveals that no Grievance Form was filed by any of the named Plaintiffs between January 2013 and January 2018. (Ex. D-9.)

47. Pursuant to the Facility's Grievance Procedures, an inmate is provided with the opportunity to appeal the IA Officer's decision regarding his/her grievance at Step 3.

> 4. Appeal of Decision. Inmates may appeal the decision of the Inmate Affairs Officer by submitting a letter of appeal to the Warden or Captain. The Warden or Captain will review the original grievance and the decision of the Inmate Affairs Officer before responding to the inmate.

(Ex. D-3 at CCC928; June 27, 2018 H'rg Tr. 120:1-18, ECF No. 181 at 378.)

48. A copy of the warden's or captain's decision is placed in the inmate file, as with any other documents generated during the entire grievance procedure. (Id. 120:1-18, ECF No. 181 at 378.)

49. Lieutenant Campbell is not aware of any grievance reaching Step 4 since he was promoted to the position of IA Officer. (Id. 178:6-8, ECF No. 181 at 436.)

50. The Facility's Grievance Procedures haves been approved annually by the New Jersey Department of Corrections since 2013. (Id. 127:18-128:1, ECF No. 181 at 387-388.)

### i. Plaintiff Emily Docherty

51. In the Third Amended Complaint, Docherty alleged female inmates are not supplied with adequate feminine hygiene products or toilet paper, and they do not receive such supplies in a timely fashion. (Third Am. Compl., ¶¶42-44, ECF No. 127.) Further, in some instances, sanitary napkins were not provided at all, forcing

22

inmates to bleed into their clothing, which they are forced to wear until clean clothing is provided. (Third Am. Compl., ¶¶42-44, ECF No. 127.) She seeks relief for unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments. (Id.)

52. Docherty was first incarcerated at the Facility in December 2013 for approximately three days. (June 6, 2018 Hr'g Tr. 128:1-9; 139:25-140:5, ECF No. 181 at 189, 201.) She returned to the Facility in August 2015 for approximately three months, and again in April 2017 for approximately five months. (Id. 129:3-8; 140:23-141:3, 147:10-24, ECF No. 181 at 190, 201-02, 208.) She also stayed at the Facility in Spring of 2018 for approximately two months. (Id. 150:20-22, ECF No. 181 at 211.) She has been at the Facility on five separate occasions. (Id. 129:9-13, ECF No. 181 at 190.)

53. Docherty received the Inmate Handbook every time she arrived at the Facility, except her last stay in 2018. (June 6, 2018 Hr'g Tr. 128:15-22, ECF No. 181 at 189.) Docherty was aware that she was required to submit a Request Slip as part of the Facility's Grievance Procedures. (Id. 142:24-143:2, ECF No. 181 at 203-04.)

54. Docherty complained about the lack of toilet paper and feminine hygiene pads for the female inmates at the Facility. (Id. 130:10-131:3, ECF No. 181 at 190-192.)

55. Docherty was advised to submit a Request Slip for her concerns. (Id. 130:19-21, ECF No. 181 at 191; 142:24-143:2, ECF No. 181 at 203-04.)

56. Docherty admitted that she only complained verbally and never submitted a Request Slip. (Id. 131:23-25, ECF No. 181 at 192; 130:8-9, ECF No. 181 at 191); 130:25-131:2, ECF No. 181 at 191-192; 133:4-7, ECF No. 181 at 194.) Docherty testified that she did not write a Request Slip for toilet paper or pads because it would take two days to get a response and she needed the supplies faster. (June 6, 2018 Hr'g Tr. 130:13-131:25, ECF No. 181 at 191-92.)

57. The Court finds that when Docherty complained verbally about insufficient toilet paper and pads, her issue was resolved by supplying her with those items, thus resolving her complaint at Step 1 of the Grievance Procedures. At best, Docherty's testimony seems to be, not that she was denied sanitary pads and toilet paper, but that she had to ask for these supplies when she ran out and the correctional officers gave her a "hard time." (Id. 131:9, ECF No. 181 at 192.) Docherty never filed a Request Slip complaining about either the response time or other actions of the correctional officers in response to her requests for toilet paper and pads.

58. Docherty was familiar with the Facility's Grievance Procedures and that the Handbook contained the procedures. She

received the Handbook every time she arrived at the Facility, except for her stay in 2018. (Id. 152:24-153:10, ECF No. 181 at 213-214.)

59. Docherty was familiar with the process regarding Request Slips and indeed submitted them for other issues—requesting addresses of family and friends. She usually received a response in approximately two days. (Id. 131:16-22, ECF No. 181 at 192.)

60. During her 2017 stay at the Facility, Docherty received responses every time she submitted a Request Slip. (Id. 147:25-148:16, ECF No. 181 at 208-09.)

61. Docherty was aware that if she was not satisfied with the response from a tier officer at Step 1 of the Grievance Procedures, she was to take her issue or concern to a shift supervisor. (June 6, 2018 Hr'g Tr. 153:15-22, ECF No. 181 at 214.) However, she testified that she did not do so. (Id. 153:23-24.)

62. Docherty has never taken her issues to the level of a formal grievance at Step 3 of the written procedures in the Handbook. (Id. 156:3-14.)

63. Despite her knowledge that a Request Slip was a required step in the Grievance Procedures and having submitted Request Slips for certain requests, Docherty's inmate file (Exs. D-10, D-10-D) contains no Request Slips raising any issues or concerns of conditions of confinement which are the subject of this litigation.

### ii. Plaintiff Jermaine Mills

64. Mills was incarcerated at the Facility in 2013 for a period and returned to the Facility in September 2014. He remained at the Facility until Summer of 2017. (June 27, 2018 Hr'g Tr. 5:18-6:18, ECF No. 181 at 263-64.)

65. Mills entered this litigation as a named-plaintiff in Plaintiffs' First Amended Class Action Complaint, filed on September 16, 2016. (First Am. Compl., ECF No. 23.) Mills was incarcerated when he filed suit on behalf of all Muslims who were incarcerated at that time or will become incarcerated at the Cape May County Correctional Facility. (Id. ¶¶5, 14.) He confirmed his status as the class representative for Muslim inmates with respect to religious issues. (June 27, 2018 Hr'g Tr. 69:20-70:1; 71:8-12, ECF No. 181 at 327-29.) Mills clarified that he participated in Friday prayers with male inmates only. (Id. 76:17-24, ECF No. 181 at 334.)

66. Upon admission to the Facility in September 2014, Mills was processed through intake, involving collection of his personal property and issuance of an "intake bag," including the Handbook. Mills reviewed the Handbook, including the section on the Facility's Grievance Procedures. (Id. 6:21-7:20, ECF No. 181 at 264-65.) Mills was aware of the four-step Grievance Procedures, including the appeals process at the fourth step. (Id. 77:4-23, ECF No. 181-335.)

67. During his 2014-2017 incarceration at the Facility, Mills first complained about being assigned to sleep on the floor rather than a bunk. When he verbally complained to a tier officer, he was told that the Facility was overcrowded. (June 27, 2018 Hr'g Tr. 7:25-8:9, ECF No. 265-66.)

68. Mills made a written request to be moved off the floor. He was advised that inmates are moved to bunks in the order of admission to the Facility. (Id. 8:13-25, ECF No. 181 at 266.) He was not provided a Grievance Form.

69. Mills was ultimately moved to a different cell and was also assigned a bunk. (Id. 18:9-15, ECF No. 181 at 18.)

70. The next issue Mills complained about was not being on the list for attending Friday prayer for Muslims—Jumu'ah. When he was advised that he had to sign up for Jumu'ah, Mills submitted several Request Slips. He was then added to the Jumu'ah list. (Id. 18:16-22, ECF No. 181 at 276.)

71. When Mills went to Jumu'ah the first few times, he noticed there were not many people attending, and one time he was alone. (Id. 18:23-1925, ECF No. 181 at 276.) Mills learned that people were not coming because they were given dirty mats that people had wiped their feet on to use as prayer mats. (Id. at 19:16-20:2, ECF No. 181 at 277-78.)

72. After verbally complaining about the condition of the mats, Mills submitted a Request Slip because he felt the mats were

still unsanitary. (June 27, 2018 Hr'g Tr. 20:24-21:13, ECF No. 181 at 279-80.) He also complained in the Request Slip about the location of Jumu'ah because it was in an area where people urinated. (Id.) In response to his Request Slip, Mills spoke to Lieutenant Denny. (Id. 21:12-21:17, ECF No. 181 at 279.) They spoke about all issues Mills had with Jumu'ah. Lieutenant Denny said he would get back to Mills but Mills never saw him again. (Id. 21:9-22:3, ECF No. 181 at 279-80.)

73. Mills filled out another Request Slip after Lieutenant Denny failed to respond, and Lieutenant Campbell came to talk to him. (Id. 28:13-19, ECF No. 181 at 286.)

74. Mills could not recall the dates of his multiple discussions with Lieutenant Campbell regarding Jumu'ah because multiple issues were recurring. (Id. 28:20-29:6, ECF No. 181 at 286-87.) The first issue they discussed was the unsanitariness of the location of Jumu'ah services. (Id. 29:7-12, ECF No. 287.) Lieutenant Campbell told Mills that if changing the location of Jumu'ah presented a security issue, there would not be anything he could do. (Id.)

75. Mills also complained to Lieutenant Campbell that Muslims were not permitted to congregate together. Lieutenant Campbell told him it presented the problem of mixing prisoners with different classifications, and Lieutenant Campbell never resolved the issue. (Id. 29:14-30:1., ECF No. 181 at 287-88.)

76. Lieutenant Campbell was able to move Jumu'ah into the law library based on Mills' complaints about the unsanitary location the services were held but the move lasted only two weeks. (June 27 Hr'g Tr. 30:2-7, ECF No. 181 at 288.)

77. According to Lieutenant Campbell, if an inmate simply requests a Grievance Form without taking the first two steps of the procedures, the shift supervisor will attempt to resolve the issue before providing the Grievance Form to the inmate. (Id. 135:21-136:7, ECF No. 393-94.)

78. Mills submitted a Request Slip on October 2, 2015 addressed to the "Grievance Committee/To whom it may concern." (Ex. D-12 at CCC170-71.) The Request Slip was his attempt to present a formal grievance. He explained that after speaking with different officers, he felt that his concerns were not being addressed despite being advised by the officers that they would attempt to make some changes. (June 27, 2018 Hr'g Tr. 30:22-32:1, ECF No. 181 at 288-90.) Mills wrote in the Request Slip:

> This correspondence is in reference to the outright disrespect towards the Muslim prayer service on Friday. It is an ongoing problem that never gets the proper attention. I have been here over a year and the situation on where how and who attends changes on a consistent basis. As well as the condition of the room, the lack of sensitivity to the religion itself needs to be changed to where discrimination does not play a part. I request a sit down with people who has a little knowledge of the law and religion so a medium can be reached. I truly feel this is a situation that can not be solved on paper.

(Ex. D-12 at CCC170-71.)

79. Mills had a conversation, which he remembered as being with Lieutenant Campbell, after submitting his October 2, 2015 Request Slip, and said he was satisfied with the conversation. (Id. 32:9-14, ECF 181 at 290.) The Request Slip includes the following reply with an officer's signature:

> I/M was spoken to & advised that I would have worker clean prayer mats. Although it will not happen this week, I/M was satisfied that room would be clean for next wk service.

(Ex. D-12 at CCC170.)

80. Lieutenant Campbell testified that the October 2, 2015 Request Slip was never presented to him, it was presented to Sergeant McGuire. Sergeant McGuire treated Mills' October 2, 2015 Request Slip not as a Step 3 grievance but as a Step 2 Request Slip. (June 27, 2018 Hr'g Tr. 129:11-24, 129:22-130:19, ECF No. 181 at 387-88.)

81. The October 2, 2015, Request Slip was placed in Mills' inmate file because he indicated that he was satisfied with the response. Mills testified that he was satisfied with the conversation that took place in response to his October 2, 2015 Request Slip, but he was not satisfied with the actual outcome. (Id. 32:13-19, ECF No. 181 at 290.) Lieutenant Campbell, however, credibly testified that the sanitation issue was resolved by cleaning the prayer mats and the courtyard where Jumu'ah services were held before the services every Friday. (Id. 172:5-17, ECF No.

30

181 at 430.) The Court finds Mills' testimony that Lieutenant Campbell never got back to him about the dirty prayer mats not credible. (June 27, 2018 Hr'g Tr. 30:1-3, 33:7-14.) Mills never proceeded past Step 2 of the Grievance Procedures for his issues of dirty prayer mats and the unsanitary condition of the room where Jumu'ah services were held. Lieutenant Campbell is not aware of any request by Mills for a Grievance Form to raise his religious issues. (Id. 131:10-18, ECF No. 181 at 389.) Lieutenant Campbell never received a formal grievance from Mills regarding his religious concerns. (Id. 129:1-10, ECF No. 181 at 387.)

82. Mills also complained verbally about the lack of religious study time for Muslims in contrast to other religious groups who were provided with religious study classes. (Id. 46:18-47:4, ECF No. 181 at 304-05.) He made a request for an Imam to assist in the development of his faith. (Id. 47:24-48:1, ECF No. 181 at 305-06.) Mills admitted that he received a response after having conversations with officers and was advised that the Facility attempted to contact a mosque in Atlantic City to arrange an Imam to provide services at the Facility; however, that never came to fruition. (June 27, 2018 Hr'g Tr. 48:3-11, ECF No. 181 at 306.)

83. After indicating to officers his satisfaction with their promises to resolve his complaints, Mills did not submit a Request Slip to complain that an Imam was not provided for religious study, and that more religious study time was not provided. Mills never

proceeded past Step 1 of the Grievance Procedures for his issues of more religious study time and an Imam to assist in religious study.

### iii. Plaintiff Frederick Schartner

84. Schartner was incarcerated at the Facility between May 28, 2016 and October 14, 2016. (June 6, 2018 Hr'g Tr. 20:24-21:8, ECF No. 181 at 81-82.)

85. Schartner entered this litigation as a named-plaintiff in Plaintiffs' Second Amended Putative Class Action Complaint filed on October 7, 2016. (Second Am. Compl., ECF No. 30.) Schartner, who suffers diabetes and vision impairment, was incarcerated when he filed suit on behalf of all inmates with disabilities who were incarcerated at that time or will become incarcerated at the Cape May County Correctional Facility. (Id. ¶¶6, 16.)

86. Schartner seeks relief for violations of the New Jersey Law Against Discrimination. (Third Am. Compl, ECF No. 127, ¶¶87-92.)

### iv. Plaintiff Gerald Dearie

87. Dearie was incarcerated at the Facility on numerous occasions between 2004 and 2018. (June 6, 2018 H'rg Tr. 79:22-24; ECF No. 181 at 140.) He was in the Facility in June 2016, October 2016 and March through September 2017. (Third Am. Compl., ECF No. 127, ¶3.)

88. Dearie entered this litigation as a named-plaintiff in the Third Amended Class Action Complaint in December 2017. (Id.) Dearie was incarcerated when he filed suit on behalf of all inmates at the Facility allegedly harmed by exposure to mold and/or have a reasonable apprehension of being harmed by mold. (Third Am. Compl., ¶¶3, 11, 14, ECF No. 127.)

89. Dearie has reviewed the Inmate Handbook and was familiar with the Grievance Procedures at least since his incarceration at the Facility in 2012. (June 6, 2018 Hr'g Tr. 80:2-6; 103:16-22, ECF No. 181 at 141, 164.)

90. Dearie was aware the Grievance Procedures involved three or four steps. He was familiar with the first step involving a verbal complaint by the inmate and tier officers' efforts to resolve the issue at that stage. Dearie agreed that many issues were resolved at Step 1 of the Grievance Procedures. (Id. 120:11-121:3, ECF No. 181-82.)

91. Dearie was familiar with the second step of the Grievance Procedures and understood it required a written submission. He understood that the written submission referenced in Step 2 of the procedures referred to the Request Slips or Inmate/Staff Correspondence. He also understood that an inmate had to submit a Request Slip. (Id. 122:9-22, ECF No. 181 at 183.) Dearie understood that pursuant to the Grievance Procedures, a shift supervisor will discuss the situation with the inmate regarding the Request Slip

and attempt to address the issues raised. (Id. 122:23-123:2; ECF No. 181 at 183-84.) Dearie remembered putting in a request slip about sleeping on the floor, with two or three follow ups. (June 6, 2018 Hr'g Tr. 123:12-23, ECF No. 181 at 184.)

92. Dearie was told overcrowding is not a grievable issue because nothing can be done about it. (June 6, 2018 Hr'g Tr. 87:4-23, ECF No. 181 at 148.)

93. Dearie admitted that he never submitted a Request Slip raising the issue of exposure to mold. (Id. 87:18-88:8, ECF No. 181 at 148-49.)

94. When Dearie reviewed his inmate file that Defendants produced in this litigation, he did not see certain Request Slips that he submitted during his incarceration at the Facility. (Id. 81:6-1, ECF No. 181 at 142.) Dearie acknowledged that he was aware of the distinction between the "pink slips" regarding medical issues and the white Request Slips associated with the Grievance Procedures. (Id. 104:1-19, ECF No. 181 at 165.)

95. The Court finds that Dearie's medical requests were submitted on "pink slips" which were not produced in this litigation. In any event, submitting a pink medical slip is not part of the Grievance Procedures.

96. Dearie verbally complained on many occasions, but he submitted only two or three Request Slips raising his issue with sleeping on the floor. (June 6, 2018 Hr'g Tr. 107:12-24.) The Court

finds Dearie never advanced past Step 1 of the Grievance Procedures concerning his complaint about exposure to mold causing him to become ill.

III.  CONCLUSIONS OF LAW

1. Plaintiff Schartner's disability discrimination claims in the Third Amended Complaint may proceed because they are brought solely under the NJLAD, for which there is no PLRA exhaustion requirement.

2. Plaintiff Mills' religious claims under the NJLAD may proceed because there is no PLRA exhaustion requirement.

3. Cape May County Correctional Facility's written grievance procedures satisfied the requirements for PLRA exhaustion, pursuant to <u>Concepcion v. Morton</u>, 306 F.3d 1347, 1354 (3d Cir. 2002).

4. In practice, Plaintiffs were not permitted to use Cape May Correctional Facility's Grievance Procedures to complain about overcrowded conditions in the jail. Therefore, the Facility's Grievance Procedures were unavailable to Plaintiffs for the issue of overcrowding.

5. Plaintiff Docherty failed to properly exhaust administrative remedies for her Eighth and Fourteenth Amendment claims regarding inadequate feminine hygiene products, toilet paper and clean clothing, as required under the PLRA.

6. Plaintiff Dearie failed to properly exhaust administrative remedies for his Eighth and Fourteenth Amendment claims regarding exposure to mold, insect infestation and inadequate ventilation, as required under the PLRA.

7. Plaintiff Jermaine Mills failed to properly exhaust administrative remedies for his First and Fourteenth Amendment claims regarding violation of his religious rights, as required under the PLRA.

IV. CONCLUSION

For the foregoing reasons, Defendants have established the affirmative defense of failure to exhaust administrative remedies under the PLRA for: Counts I and II, Docherty's Eighth and Fourteenth Amendment claims regarding inadequate feminine hygiene products, toilet paper and clean clothing; Counts I and II, Dearie's Eighth and Fourteenth Amendment claims for exposure to mold, insect infestation and inadequate ventilation; and Count III, Mills' First and Fourteenth Amendment claims regarding violation of his religious rights.

Counts I and II under the Eighth and Fourteenth Amendments for overcrowding may proceed because administrative remedies were unavailable to Plaintiffs. Count IV (religious discrimination) and Count V (handicap discrimination) under the NJLAD may proceed because PLRA exhaustion is inapplicable.

An appropriate Order follows.

Date: January 7, 2019

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**